## SUPREME COURT.

### LIVERMORE, CLEWS *et al.* agt. RICHARD BAINBRIDGE.

A *referee* has no power on the trial to allow a defendant to withdraw a second de-
fense in the answer, consisting of a counter-claim, upon which he commences a
cross-action against the plaintiffs, and then allow him to interpose a second de-
fense to the answer in the original action, as an amendment thereof, by inserting
substantially, but in a different form, the same counter-claim again, claiming
$130,000 damages; and all this without notice to the plaintiffs or their attorney,
except on the motion to amend the answer.
To cap the climax, the referee in this case, before making his report, called upon
one of the plaintiffs personally, and suggested to him whether it would not be
better for the plaintiffs to settle the matter with the defendant by paying him
$35,000, which defendant would probably accept, as there were matters in evi-
dence in the case which led him to believe that if he did give judgment for the
defendant, it would necessarily be for a very large amount. The plaintiffs, hav-
ing in their complaint, claimed from the defendant on contract some $17,000, did
not feel disposed to accept the friendly advice of the referee, whereupon, a few
days subsequently, the referee reported against the plaintiffs, and as due the de-
fendant, the sum of $120,000.
Judgment vacated, and report of referee set aside for irregularity, and order of
reference discharged.

*New York Special Term, February,* 1873.

THIS was an action to recover a claim growing out of
stock transactions. The necessary facts to an understanding
of the case will appear in the opinion of the court.

FANCHER, *J.*—The defendant's testator, Richard Bain-
bridge, in 1862 commenced dealing with the plaintiffs as
brokers. From September, 1862, until May, 1863, the
transactions occurred out of which this litigation has arisen.
The plaintiffs received from Bainbridge a deposit for a mar-
gin, and made purchases and sales, for his account, of stocks,
gold and United States demand notes. His original deposit
with the plaintiffs was $5,070 44, and his agreement was to

keep on deposit with them a margin of ten per cent. on
the amount carried for his account.   On the 27th of May,
1863, the plaintiffs rendered· to Bainbridge an account of all
transactions to that date, and on the 12th of August, 1863,
a further account was rendered by the plaintiffs to Bainbridge,
detailing the transactions from January 1, 1863, to May 30,
1863.   By this account a balance appeared to be due to the
plaintiffs—$16,351 45.   The account consisted of over five
hundred items, and covered thirty-four pages.   The plaintiffs
assert that there are a few errors in the account, which, cor-
rected, would add $705 53 to the balance due them from
Bainbridge.   They admit he should have credit for $3,519 50
upon the amount due plaintiffs, that being the sum allowed
to him by the arbitration committee of the stock exchange
in respect of part of the gold held by the plaintiffs on his
account.

On the 3d of November, 1863, this action was brought
by the plaintiffs to recover the balance thus claimed as
due from Bainbridge.   It was an action upon an account
stated, and the summons was for a money demand on con-
tract. ˙ The defendant's answer to the complaint was served
on the 19th February, 1863, containing two defenses.   The
first was to the effect that numerous errors existed in the
plaintiffs' account, and the second defense averred that the
sales of the stocks, &c., for the defendant's account were un-
lawful, and that the purchases made to cover short sales
were invalid, by ˙reason whereof the defendant averred he
had "sustained damage to a large amount, and·equal to the
amount claimed in the plaintiffs' account."

On the 15th November, 1864, Bainbridge commenced an
action against Livermore, Clews & ,Co., to recover damages
for the alleged unlawful sale and conversion of his stocks,
gold and demand notes, alleging an improper sale and con-
version thereof on the 27th May, 1863, and in that action
he claimed damages for $52,000.   It appears that on the
24th January, 1865, a motion was made in the original ac-

tion, by the counsel for the defendant Bainbridge, to with-
draw the second defense above mentioned.   The referee, in
his letter of March 2, 1870, to Mr. Hewitt, the defendant's
attorney, states : " The motion made by you in this case to
withdraw your counter-claim, the decision of which was
reserved at the time, I have decided to grant, not seeing any
prejudice to arise in the action to the plaintiffs herein."
Thereupon an affidavit was made on the 3d of March, 1870,
by the defendant's attorney, and used in a motion on the
cross-action against Livermore, Clews & Co., in which he
deposed " that the action now pending before John P.
Crosby, referee, does not involve the issues contained in this
action; that about the time of the commencement of this
action this deponent moved before Mr. Crosby, the referee,
to withdraw the second and separate defense therein ; that
the question of the right of defendant to withdraw said de-
fense was submitted to said referee, and after due deliber-
ation was decided in favor of the defendant in that action."

The referee, by a letter to one of the plaintiffs' attorneys,
dated March 3, 1870, informed him of the withdrawal of
the second defense.  It appears, by the motion papers, that
the withdrawal of the counter-claim, or second defense thus
referred to, was made for the purpose of some supposed ben-
efit to Bainbridge in his action against Livermore, Clews &
Co., and the fact of said withdrawal was made prominent
on a motion to stay proceedings in that action, which was
decided on the 7th of March, 1870.

At some time thereafter—but when, the papers before me
do not disclose—the referee entertained and granted a mo-
tion made by the defendant's counsel " to amend the answer
so as to include an allegation of damage to defendant by
reason of the unlawful acts of plaintiffs, as set forth in the
second defense, to the amount of $130,000, and a demand
of judgment for that amount, with costs."   This motion
was objected to, without avail, by the counsel for the plain-
tiffs, and the referee, on that new defense, has reported against

the plaintiffs, and ordered a judgment for $120,000 and costs. No actual amendment was at the time made by the formal drawing or service of such amended answer, although the judgment roll in this action contains what purports to be such amended answer. When it was first actually drawn is not explained. The question here arises whether the referee had power to order such an amendment. It seems plain that the referee exceeded his power. When the amendment was allowed there was no defense of the nature of a counter-claim contained in the issue which could be enlarged by such an amendment as was allowed, nor was it possible for the referee to allow such a counter-claim to be introduced in the answer, as it then stood, without permitting a substantial change of the defense. In effect, the amendment amounted to a new defense of a nature different to that contained in the answer, which it has often been held, is improper to be allowed on the trial either by a judge or a referee (*Ransom* agt. *Wetmore*, 39 *Barb.*, 104 ; *Johnson* agt. *McIntosh*, 31 *Barb.*, 272 ; *Walton* agt. *Bennett*, 16 *N. Y.*, 200 ; *Whitford* agt. *Hungerford*, 42 *N. Y.*, 185 ; *Ford* agt. *Ford*, 35 *How.*, 321). An amendment which proposes a new cause of action or defense should not be allowed.

There is ground for the supposition in this case that the amended answer, as it now appears on the judgment roll, was not prepared until after the decision and report of the referee. It is asserted by the plaintiffs' counsel that they never saw it till it appeared on file in the roll. Had it been competent for the referee to allow the defendant the privilege of making such an amendment, the answer should have been drawn and verified and served as amended. Then an opportunity to reply to it would have been afforded to the plaintiffs. Perhaps the statute of limitations or other reply would have been interposed to the counter-claim.

In *Johnson* agt. *McIntosh*, (*supra*), the referee admitted proof of a defense not asserted in the answer, and on motion, after trial, the special term allowed the answer to be amend-

ed to cover the defense. But the judgment was reversed, and the amendment pronounced to be improper. So in *Woodruff* agt. *Dickie* (31 *How.*, 164), it was held that an amendment is the correction of some error or mistake in a pleading already before the court, and there must be something to amend by, whereas the insertion of facts constituting a new cause of action or defense would be a substantial pleading and not an amendment of an existing pleading. It was further said in that decision that there are no cases which furnish a satisfactory reason for holding such an amendment to be within the power of the court to grant. It was not necessary that Bainbridge should set up, by way of counter-claim, his supposed demand against the plaintiff. He was at liberty to bring a cross action for the same (*Peck* agt. *Minot*, 4 *Robts.*, 323 ; *Lignat* agt. *Redding*, 4 *E. D. Smith*, 285 ; *Gillespie* agt. *Torrence*, 25 *N. Y.*, 306 ; *Collyer* agt. *Collins*, 17 *Abb.*, 468). He elected to abandon and withdraw his counter-claim and to bring a cross action on his alleged demand. That action is still pending. After he had thus made his election it was not competent to allow a further amendment of the answer in the original action by re-instating the former abandoned counter-claim in an amended form while the cross action was pending. The law does not favor double vexation for the same cause of action (16 *Barb.*, 461 ; 2 *Duer*, 611 ; *Mills* agt. *Block*, 30 *Barb.*, 549 ; 15 *Abb.*, 191). That plaintiffs proceeded to move to set aside the referee's report for irregularity before the entry of the judgment. The order to show cause permitted the entry of the judgment without prejudice to the motion. It is, therefore, proper to consider on this motion the question of the power of the referee to allow the amendment without remitting the plaintiffs to an appeal from the judgment. I am clearly of the opinion that the referee had no power to make the amendment on which the enormous judgment in this case is founded, and that his report, for that reason, should be set aside.

There is another ground of irregularity alleged. One of the plaintiffs states in his affidavit, that before the case was summed up, the referee came to his office and told him he should advise him to settle the case. He further states he came to him a second time, after the cause was summed up, and, in one or the other interview, mentioned the sum of $35,000 as a proper sum to be paid the defendant by the plaintiffs. The referee himself has made an affidavit on the subject, in which he admits he called on Mr. Clews, but says it was upon another matter; that incidentally he spoke of this suit, and having been long acquainted with the firm of which said Clews was a member, and having been always on the most friendly terms with said Clews and his partner Livermore, made a remark in substance that he had not at all come to any conclusion about the case as yet, but that there were matters in evidence in the case which led him to believe that if he did give judgment for the defendant it would necessarily be for a very large amount, and he then suggested to said Clews that it might be well to think the matter over in that light, and, perhaps, it might be to their interest to settle it; that he has some recollection of mentioning some sum as having been discussed or spoken of by defendant's counsel, or some of them, and he thinks the sum was $35,-000; but if he did mention such sum, or any sum, as having come from the other side, and not originating with him, said referee. A referee should not attempt to exercise the functions of a negotiator. However honest his intentions or well-meant his endeavors, the failure of the attempt may be ground for the supposition that his subsequent judgment was, in some degree, influenced by it. The referee is a gentleman of high standing and character, and it cannot be supposed that, in fact, he has allowed his mind to be influenced by the refusal of the plaintiffs to yield to his suggestions of compromise. But it has been held that the same rule should be applied to referees as to jurors (*Gale* agt *Garmits*, 4 *How.*, 253). Whenever a juror has been guilty of

an irregularity which gives any reason to suppose that either party has been prejudiced by it, the verdict will be set aside (1 *Hill*, 211; 1 *Cow.*, 221; 2 *Cow.*, 589; 3 *Cow.*, 355; 5 *Cow.*, 283). Courts have ever guarded with jealous watchfulness the right of litigants to the unbiassed judgment of the jury or the referee. It has been remarked that whenever it has been seen that by any means or influence beyond what has transpired on the trial and in the presence of the parties, the minds of the jury may have been influenced, their verdict will be set aside (*Dorlon* agt. *Lewis*, 9 *How.*, 4). What was said in that case is appropriate here, " a referee owes it to himself not only to avoid all improper influences, but even the appearance of evil." Whether satisfied with the decision or not, no one should be left for a moment to question its fairness. It is certainly unusual for a referee to receive the intimation from one party that $35,000 is a "proper sum" to be paid to him by the other, and to be the bearer of the suggestion to the other side with the incitement " that it might be well to think the matter over," in the light of the prediction that if he did give judgment for defendants it would necessarily be for a very large amount. Whether the failure of the plaintiffs to comply with the suggestion of the referee had any influence upon his mind or not, it seems proper that a referee or jury should be delivered from the possibility of bias or temptation under such circumstances. An order will be granted vacating the judgment entered in this action, and setting aside the report of the referee for irregularity, and also discharging the order of reference.