BARRETT, J.
—The discussion at special term was solely upon the question whether the referee had been proved guilty of corruption uby very clear and convincing proof.” The learned judge examined the facts carefully, and came to the just conclusion that the case on that head had not been made out. The error consisted in limiting the consideration of the facts to this charge. The real question here was not whether the referee was guilty of actual corruption but whether the fairness of his decision was justly questioned. It is the settled law of this state that any indiscreet action of a referee, from which improper inferences can be drawn, suffices to set aside his report. Yale v. Gwinits, 4 How. Prac. 253 ; Dorlon v. Lewis, 9 id. 4 ; Roosa v. Turnpike Road Co., 12 id. 297 ; Greenwood v. Marvin, 29 Hun, 99 ; Carroll v. Lufkins, id. 17 ; Burrows v. Dickinson, 35 id. 492 ; Livermore v. Bainbridge, 14 Abb. Prac. (N. S.) 227 ; Leonard v. Mulry, 93 N. Y. 392.
Our courts have invariably taken an elevated view of this question. Thus, in Roosa v. Turnpike Road Co., supra, HARRIS, J., concluded his opinion with this remark:
“ All agree that the administration of the law must be pure and impartial. But it is scarcely less important that the conduct of those to whom its administration is intrusted should be such as to furnish to those who litigate, no just ground of suspicion.”
In Livermore v. Bainbridge, 44 How. Prac. 363. Justice FAHCHER quotes with approval an observation which was made in Dorlon v. Lewis, as follows:
“A referee owes it to himself, not only to avoid all improper influences, but even the appearance of evil.”
In the same case, upon appeal, DAVIS, J., said :
“ The interests of justice require that the general rules designed to prevent suspicion of impurity in the administration of justice should be rigidly adhered to.” 14 Abb. Prac. (U. S.) 232.
In many of the cases the integrity of the referee was unquestioned, while in one, at least, his high character was adverted to.
In the present case the conduct of the referee was not only indiscreet, but improper. Upon his own statement, he conversed with the defendants’ counsel upon the merits of the case, in the absence of the plaintiff’s counsel. This of itself was an impropriety. What he said, however, was grossly improper, namely, that “ he thought he would have to decide in defendants’ favor on the law point” ; that he was writing an opinion on the case ”; and that the plaintiff’s testimony “ was given in an unsatisfactory manner, and needed corroboration.” This is the referee’s own account of his language, while the attorney’s version of what transpired characterizes the language used as- much more decided and *230 emphatic. The attorney’s version need not, however, be scrutinized, as, upon the referee’s own showing, his conduct was inexcusable. At this very interview too, there was a difference between the referee and the defendants’ attorney with regard to the stenographer’s fees. This was significant in view of the referee’s statement that the stenographer looked to him for payment of the bill. It was also significant in view of the fact that this stenograrapher was selected by the referee after a stenographer previously agreed upon by the parties had been discharged by him. The referee says, to use his own language, that he “disputed” this attorney’s “evidently forced, unjustifiable construction ” of a stipulation which had previously been entered into with regard to stenographer’s fees. The • attorney said he objected to the bill as excessive, and that he also claimed that his client was bound to pay but one-half of these fees. The referee insisted that the attorney was liable for the whole bill. The attorney finally offered to tax the stenographer’s bill, and then to pay the defendants’ share of it. Subsequently, the stenographer called upon the attorney, but the latter adhered to his position; namely, that he would only pay one-half of a proper bill. There this matter rested until not quite a month later, when the referee reported against the defendants, and then it was learned that the plaintiff had paid in full the stenographer’s bill to which the defendants’ attorney had so persistently objected. I say in full, but to be concise, the bill was $326.54, and the payment $325. It was entirely natural, under these circumstances, that even a professional mind should view the referee’s change of opinion with suspicion. . But what must the client have believed '? And what, indeed, was he quite justified in believing? Surely, that the referee was “ with him” at the tim'e of the interview with his attorney, and that the opinion which the referee then said he was then writing was unquestionably in his favor. What must he have thought when he subsequently learned that the referee had completly changed his mind after the dispute regarding the stenographer’s fees ? When he learned, too, that the plaintiff had not been as injudicious as he, and had paid the whole bill without question ? He was certainly justified in the belief that there was some sinister connection between his counsel’s persistent attitude with regard to the stenographer’s fees and the referee’s extraordinary change.'
Our conclusion is that the referee’s action was not only indiscreet, but improper, and that his report cannot be permitted to stand. Few laymen could be brought to believe,' upon such a state of facts, that they had had a fair trial; and the administrations of justiefe would fall into disrepute were the court to sanction indiscretions, and improprieties, tending to weaken the faith of the lay mind in its purity.
The order appealed from should be reversed, with costs, the motion to set aside the report granted, and the order of reference vacated.
All concur.